LONG DOCK COMPANY v. CHARLES E. HENDRICKSON, JR., ET AL., STATE BOARD OF ASSESSORS.

Argued November 6, 1913—Decided March 4, 1914.

The assessment, by the state board of assessors upon the Long Dock property in Jersey City, for taxes for the year 1911, is not invalid, since there is no satisfactory proof in the case that the assessment was made by illegal methods, or upon erroneous principles, or for improper amounts, or is unsupported by evidence, the weight and effect of which the board was constituted by law to determine.

On *certiorari* removing assessments, &c., on second-class railroad property for 1911.

Before Justices GARRISON, TRENCHARD and MINTURN.

For the prosecutor, *Gilbert Collins, George S. Hobart* and *Robert J. Bain.*

For the defendants, *Edmund Wilson*, attorney-general, *John R. Hardin* and *John Franklin Fort.*

The opinion of the court was delivered by

MINTURN, J.   The assessments upon twenty-three parcels of land in the taxing district of Jersey City are the subject of consideration upon this writ.

Of these parcels twenty-two are located outside of the main stem of the Erie railroad, and the remaining parcel comprises the terminal station of the Erie railroad, comprehending in that designation the ferry buildings, racks, floats, waiting rooms, train sheds and platforms.

The lands involved begin at the exterior line for piers on the Hudson river, and extend substantially backward to the west on either side of the Erie railroad main stem to Provost street; and on the north are bounded by the Delaware, Lackawanna and Western railroad property, and on the south by

that of the Pennsylvania railroad, east of Bergen hill, and on either side of the main stem are located other parcels of land, used as an adjunct to the railroad, and west of the Bergen hill from the point of the railroad's exit from its tunnel or cut; other parcels extend westwardly over the meadows to what is known as Penhorn creek on the Secaucus meadows.

The latter tracts are reclaimed from the meadows by filling in, and are mainly utilized for the storage of railroad rolling stock.

The only physical interruption in the water front terminal tract is the existence of a city street, called Pavonia avenue, which running longitudinally from west to east, supplies the only available outlet in Jersey City to the Erie or Pavonia ferry.

The assessment upon the same parcels of land have been the subject of litigation in this court, and the Court of Errors and Appeals during the years 1906, 1907, 1908 and 1909, and the results of that litigatiton are embodied in *Long Dock Co.* v. *State Board,* 49 *Vroom* 44; *S. C.,* 53 *Id.* 21; *S. C.,* 55 *Id.* 762.

The prosecutor reduces its objections to the assessment *sub judice,* to two general grounds—*first,* that it was made upon erroneous principles; and *secondly,* that the assessments and taxes levied on the lands referred to are excessive.

We think, under substantially similar conditions, and upon objections not radically different from those offered here, this court in the cases referred to has practically solved these contentions in favor of the validity of the assessment. Those cases are authority for the proposition that this court will not in settling the question of fair value, oppose its judgment to that of an administrative board, entrusted by law with the duty of fixing the fair value or market value of land for the purposes of assessing the same for taxes, where there is testimony before the board, the weight and value of which it is required to determine, to which the members of the board may add their individual personal knowledge and judgment. *Long Dock Co.* v. *State Board, supra.*

The prosecutor attempts to differentiate the case *sub judice,* from the previous determinations, by the insistence that the *modus operandi* of the board in using and applying their personal knowledge was not under review in those cases, and that it is attempted to be shown here.

We know of no provision of the statute which requires the members of the state board sitting as an appellate board to submit to an examination for the purpose of discovering their personal views and judgment in the controversy.

It was within the power of the prosecutor to compel the board by writ of *certiorari* to disclose the principles upon which they made their assessment, and the manner in which those principles were applied, but the prosecutor has not deemed it necessary to adopt that procedure.

We are remitted therefore in the determination of the case to the inquiry whether in view of the testimony adduced the assessment complained of is illegal, as made in excess of true or market value.

The prosecutor has devoted a portion of its brief to an attempt to show that in assessing the lands the board having ascertained the money or market value of the lands from the testimony of experts, applied to it an unknown multiple and thus fixed the assessment.

The answer to this obviously is that if such principle was adopted the fact could be ascertained by *certiorari,* requiring the board to certify whether such a method was pursued.

In the absence of the information that such a return would disclose, we are left to conjecture from the testimony as to the principle upon which the board proceeded, and we must assume in that situation that their *modus operandi* was consistent with legal methods and principles.

It is contended that the board, for the purpose of fixing their assessment, arbitrarily divided the water front lands into parcels and assessed each parcel separately, without regard to the value of 'the remaining parcels. While this seems to have been the method adopted by the board, we are not directed to any authority which characterizes it as illegal. *Per contra,* the prosecutor's witnesses adopted what has been called

the "zone method," which in essence was the same, and thus fixed their valuations of the water front land by arbitrarily selecting a line to the west of the Hudson river, and establishing all land east of it as a water front "zone," upon which it contends the advantages of the water frontage, *ex necessitate,* must be reflected.

The adoption of the different methods may produce different results, but we cannot supersede the judgment of the board with our judgment upon a practical question of methods of valuation, unless the principle which has obtained be inherently and legally vicious.

There is apparently upon the face of this record as much reason for dividing the land into plots for the purpose of measuring its value, as there is to draw a line seven hundred feet back from the river front and determine that there the reflected value of the shore front must of necessity stop.

A comparison of values of lots upon the line of the intersecting street, Pavonia avenue, supplied another method to the prosecutor of ascertaining true value, and this is the method usually pursued in such cases. But the attitude of the board, as we view it, was that this so to speak segregated land of the prosecutor, because of its availability as a whole for railroad uses, possesses a value, as an entirety, which cannot possibly be estimated by ascertaining the value of its dismembered parts.

With this conception of true value as the criterion, testimony was presented for the purpose of showing the value as a whole of other water front terminals.

In *State Board of Assessors* v. *Central R. R.,* 19 *Vroom* 278, in the Court of Errors, Chancellor Runyon speaking of railroad property, said that property "is so circumstanced by the peculiar use to which it is put as to make it on that account a class by itself;" and Mr. Justice Dixon, in the same case, says: "The use made of them (railroad properties) forms as just and as common a basis of classification as does their essence."

It is this peculiar use which presents the rationale upon which the courts legally justify the segregation of the land

of railroad companies from the land of other owners and
erect it as a class for separate and distinctive treatment as a
tax paying asset.    *Central Railroad* v. *State Board,* 20 *Vroom*
1; *Cincinnati, B. O. & O. R. R.* v. *Kentucky,* 115 *U. S.* 321.

In the latter case the United States Supreme Court sus-
tained, under the provisions of the Kentucky constitution, a
system of valuation for railroad property, entirely different
from that imposed upon the remaining property of the state,
and Mr. Justice Matthews, in dealing with the subject in his
opinion, says: "The fact that the legislature has chosen to
call a railroad for the purposes of taxation real estate, does
not identify it with farming lands and town lots in such a
sense as imperatively to require the employment of the same
machinery and methods for all in the process of valuation
for the purposes of taxation.    Calling them by the same
name does not obliterate the essential difference between
them."

And it seems to us that it cannot be successfully argued
that this "essential difference" is the element of franchise,
which is to be separately valued under our statute.    The in-
quiry need not necessarily be what is the fair market value
of the lands for this particular railroad in use, and as used,
but what is the value of the lands for a railroad use of a kind
similar to that in use?

The former inquiry may include franchise, and conse-
quently be held illegal; the latter inquiry need not neces-
sarily involve that factor; and hence the value of lands
similarly situated and similarly used may present not a
conclusive answer to the inquiry, but certainly if we are
searching for available comparisons as data to establish value,
we find in it one likely to work out, as nearly as can be an
equitable and correct result, rather than a method which splits
up an entire plant, and by valuing the disjointed sections
seeks an aggregate that may represent value of the whole.
Availability of the whole for a railroad use devoid of the
element of franchise, would seem to afford the criterion of
value.    *Brooklyn City Railroad* v. *Tax Commissioners,* 199
*U. S.* 48.    An illustration suggests itself if we take two

hostelries upon opposite corners, both within a block of a ferry and railroad entrance, from which daily multitudes of humanity pour forth in almost endless procession. One place is as attractive in appearance as the other, but the vast percentage of people year after year favor the one, and almost ignore the other. The interior attractions for man and beast are no more seductive in the one than in the other. Each property pays a similar license or franchise fee, and the difference in the assessment of the properties for taxation purposes is practically nominal. Here it must be manifest that the market values of the two places are not alike. That the license to do business or the franchise privilege does not constitute the difference in value must be obvious.

There must therefore be inherent in the more favored plant an element of value, which political economists denominate as unearned increment, or to designate it more scientifically, an exclusive business or monopoly value, arising from the facts of favorable location, business conditions and practical inability to duplicate the situation in the locality.

Under such conditions comparison with plants similarly situated as nearly as may be, seems to us to afford a reasonable standard of valuation, and not an unfair or inequitable method of measuring true value.

Considerations of this character, probably within the personal knowledge of the assessors, may have combined with the testimony presented to produce this assessment, and we cannot say that the result so produced is reached by an erroneous method or based upon illegal principles in the absence of proof to that effect, which the case does not supply.

The assessment will be affirmed.